# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Samantha White, on behalf of herself and all others similarly situated,<br><br><br>Plaintiff<br><br>v.<br><br>American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc.,<br><br>Defendants. | **Case No._____**<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**Demand for jury trial** |

Plaintiff, on behalf of herself and all others similarly situated (the "Class"), brings this action for damages and injunctive relief under the federal antitrust laws against American Airlines, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines, Inc. (collectively "Defendants") arising from Defendants' conspiracy to restrict available flight capacity and thereby to fix, raise, maintain or stabilize prices of passenger airline tickets. Defendants' conspiratorial ends were accomplished through a number of means, including colluding to limit seat capacity and by indicating to each other how quickly they would add new flights, routes and extra seats in order to effectively coordinate limiting the capacity of passenger airline travel in the United States.  Based upon personal knowledge, information, belief, and investigation of counsel, Plaintiff specifically alleges as follows:

## NATURE OF THE CASE

1.     This lawsuit is brought as a class action on behalf of Plaintiff and all individuals and entities in the United States who purchased domestic air passenger transportation services directly from one or more Defendants or their affiliates during the Class Period.

2.     Airline travel has become an entrenched fact of American life.  Unfortunately, even though the market for airline travel is huge, the number of carriers has declined such that there are effectively four airlines available to most passengers: the four Defendants.  Indeed, Defendants control over 87% of flights within, to, or from the United States.[1]

3.     As with any sought-after service that is only provided by a few companies, the concentration of the airline industry has created an opportunity for improper collusion.  In fact, during the recent merger between American and US Airways, the Department of Justice ("DOJ") expressed concern that consolidation within the industry would lead to increased coordination. For example, the DOJ cited the following example of an improper cross-market initiative, "Back in 2009, US Airways lowered fares and relaxed restrictions on flights from Detroit, then a Delta/Northwest stronghold, to Philadelphia.  Delta responded by lowering its fares on US Airways' lucrative Boston-Washington route.  US Airways' pricing team got the message loud and clear and concluded it had far more to lose by going ahead with the Philly-Detroit move and walked it back."[2]

4.     Under the guise of "capacity discipline," Defendants collusively caused domestic airline ticket prices to rise to and/or remain at supracompetitive levels.  In theory, reducing unused capacity can be an efficient decision that allows a company to reduce its costs, ultimately

---

[1]*See* http://www.cnbc.com/id/100461115.

[2]*See_http://www.washingtonpost.com/blogs/wonkblog/wp/2013/08/15/why-the-justice-department-blocked-the-american-us-airways-merger/* (visited September 4, 2015).

leading to lower consumer prices.  In the airline industry, however, Defendants' coordinated capacity discipline has resulted in fewer flights and higher fares, despite dramatically falling costs during the same period.

5. On information and belief, Defendants have coordinated their efforts regarding "capacity discipline," which has the effect of restraining growth and reducing established service, through behind-the-scenes coordination and policing.

6. On July 1, 2015, it was reported that the United States Department of Justice ("DOJ") confirmed an ongoing investigation into whether Defendants were colluding to limit flight routes and available seats, thus keeping airfares at artificially inflated prices.

7. Plaintiff brings this action on behalf of all persons or entities that purchased airline tickets for a domestic flight on Defendants' aircrafts (the "Class") at any time from July 10, 2011 through the present (the "Class Period").  But for Defendants' unlawful conduct, Plaintiff and the Class would not have paid supracompetitive prices for airline tickets issued by Defendants.  As a direct result of Defendants' illegal acts, Plaintiff and the Class have suffered losses and damages to their business and/or property in the form of inflated prices for airline tickets.  Additionally, Plaintiff and the Class are threatened with further injury unless Defendants are enjoined from continuing the unlawful conduct alleged herein and from entering into any other combinations, conspiracies, and/or agreements having similar purposes and effects.

## JURISDICTION AND VENUE

8. Plaintiff's claim for injuries sustained by reason of Defendants' violations of §1 of the Sherman Act, 15 U.S.C. §1, are brought pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C.

§§15 and 26, to obtain injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' costs and fees.

9.     This Court has original federal question jurisdiction over the Sherman Act claim asserted in this Court, pursuant to 28 U.S.C. §§1331, 1337, and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

10.    Defendants engaged in conduct that caused direct, substantial, and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States during the Class Period.

11.    Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

12.    This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia*, each Defendant: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of domestic air passenger transportation services throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) was engaged in an illegal conspiracy that was directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.

13.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

**PARTIES**

**A.      Plaintiff**

14.     Plaintiff Samantha White is a resident of Greensboro, North Carolina.  During the Class Period, Ms. White purchased air passenger transportation services directly from one or more Defendants and has been injured in her business or property by reason of the antitrust violations alleged in this complaint.  Specifically, from in or about 2005 to present, Ms. White has purchased tickets directly from Defendants Delta Air Lines, Inc. and United Airlines, Inc. for travel between Greensboro and New York, West Palm Beach, Charlotte and Atlanta.

**B.      Defendants**

15.     Defendant American Airlines, Inc. ("American") is a domestic corporation with its principal place of business located at 4333 Amon Carter Boulevard, Fort Worth, Texas 76155. American conducts air passenger transportation services throughout the United States, including flights to and from this District.  American is a subsidiary of American Airlines Group, Inc., also based in Fort Worth. American Airlines Group, Inc. is also the holding company controlling US Airways, which merged with American in 2013. Combined, American, US Airways, American Eagle, and US Airways Express run 6,700 flights per day to 339 destinations in 54 countries. In 2014, American flew 194 million passengers and operated 983 mainline jets. American Airlines Group reported a net operating income of $5.073 billion and net income of $4.184 billion in 2014, up from $1.935 billion net operating income and $1.244 net income in 2013.

16.     Defendant Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its principal place of business located at 1030 Delta Boulevard, Atlanta, Georgia 30354.  Delta

conducts air passenger transportation services throughout the United States, including flights to and from this District.  Delta, and related Delta Connection carriers, fly approximately 15,000 flights per day to 334 different destinations in 64 countries.   Delta serves 170 million customers per year and operates over 700 aircraft. Delta's operating income in 2014 was $2.206 billion and its net income $659 million.  In 2013, Delta's operating income was $3.4 billion and its net income, accounting for an $8 billion income tax benefit, was $2.527 billion.

17.     Defendant Southwest Airlines Co. ("Southwest") is Texas corporation with its principal place of business located at 2702 Love Field Drive, Dallas, Texas 75235.  Southwest conducts air passenger transportation services throughout the United States, including flights to and from this District.  Southwest flies approximately 3,600 flights a day to seven countries. Southwest serves over 100 million customers annually, and is the largest carrier in terms of "originating domestic passengers boarded."[3] In 2014, Southwest had an operating income of $2.2 billion and a net income of $1.1 billion.  Southwest's common stock (LUV) rose 125% in 2014 and was the top performer in the S&P 500.

18.     Defendant United Airlines, Inc. ("United") is a Delaware corporation with its principal place of business located at 233 S. Wacker Drive, Chicago, Illinois 60606.  United conducts air passenger transportation services throughout the United States, including flights to and from this District.   In 2013, United merged with Continental Airlines.  United flies approximately 5,000 flights a day, to 373 destinations in 60 countries.     In  2014,  it  operated 691 mainline jets and 531 regional jets, serving 138 million passengers.    In  2014,  United  had an operating income of $2.373 billion and a net income of $1.132 billion.   A  year  earlier,  in 2013, United had an operating income of $1.249 billion and a net income of $571 million.

---

[3] *See* http://www.swamedia.com/channels/Corporate-Fact-Sheet/pages/corporate-fact-sheet (visited on September 4, 2015).

19.     Defendants and their co-conspirators, directly and through their affiliates, sold domestic air passenger transportation services in the United States at artificially inflated prices during the Class Period.

## AGENTS AND CO-CONSPIRATORS

20.     On information and belief, at all relevant times, other airlines, entities, and/or persons willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

21.     Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct in this complaint.

22.     Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy or the anti-competitive conduct.

## INTERSTATE TRADE AND COMMERCE

23.     Defendants are the leading providers of domestic air passenger transportation services in the United States.

24.     During the Class Period, Defendants or one or more of their affiliates sold domestic air passenger transportation services throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial District. Thus, Defendants' unlawful acts occurred within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States.

25.     Defendant's unlawful acts had a reasonably foreseeable anti-competitive effect upon interstate commerce within the United States, and Defendants have deprived Plaintiff and

7

the Class of the benefits of free and open competition in the purchase of domestic air passenger transportation services throughout the United States.

## FACTUAL ALLEGATIONS

26.     This action alleges collusion among the major passenger airlines to limit routes, information and available seats in order to keep the price of airline tickets for passenger travel on U.S. routes artificially high.  Plaintiff alleges that Defendants colluded and agreed to limit seat capacity and illegally signaled to each other how quickly they would add new flights, new routes, and extra seats on existing fights and routes, in order to restrict available capacity and thus keep prices of passenger airline tickets artificially high.

**A.     Background**

27.     In 1978, Congress passed the Airline Deregulation Act ("ADA"), which deregulated the domestic airline industry.    The ADA removed government control over fares, routes, and market entry of new airlines, allowing market forces to dictate these and other facets of the industry.  Since 1978, Defendants have competed over fares, routes, and seats.   In recent years, however, the airline industry has seen significant express coordination, which has led to higher fares, new and increased fees, and less options for American consumers.

28.     Today, the domestic airline passenger industry is highly concentrated.   As    a result of a series of mergers, including in particular since 2008, Defendants American, Delta, United and Southwest, the four largest airlines in the United States, now control up to 87% of the domestic airline market.[4] News sources report that the airlines also collected $3.6 billion in bag fees and $3 billion in reservation-change fees in the past two years.

---

[4] These mergers began in 2005 with the merger between US Airways and America West creating US Airways.  In 2008, Delta and Northwest Airlines merged into Delta.  In 2010, United and Continental merged to form the current "United."  In 2011, Southwest and AirTran merged.  In

29.     Increasing consolidation among large airlines, namely Defendants, hurts passengers. An August 2012 presentation from US Airways observed that industry consolidation has resulted in "Fewer and Larger Competitors."[5] The structural change to "fewer and larger competitors" has allowed "[t]he industry" to "reap the benefits."[6] Those benefits to the industry were touted in the same presentation as including "capacity reductions."[7]

30.     A recent study of airline industry competition, prepared for the Travel Technology Association, concluded that there is minimal price and capacity competition among the major airlines, including those operated by Defendants.  The study found that, between 2013 and 2014 alone, the average fare per 100 miles increased by $50.  This happened even though the airlines enjoyed a 24% decline in the price of jet fuel and a 3% drop in operating costs.  In a properly operating market, these cheaper costs would drive prices down.

31.     Since the most recent period of consolidation began in 2008, airfares have mostly outstripped inflation.   At one point last year they were up 22%, as against an overall rise in consumer prices of 12%, according to the Bureau of Labor Statistics.   According to Airlines for America (an industry trade association), fuel accounted for 27.6% of operating costs in the last quarter of 2014.

32.     The airline industry has earned record profits, including a combined $19.7 billion in profits in the past two years.   The International Air Transport Association ("IATA"), an international trade body representing over 240 domestic and international airlines, predicts that

---

2013, American and US Airways announced their $11 billion merger, creating the largest airline in the world.

[5] DOJ Complaint, ¶35, *United States v. US Airways Group, Inc.*, No. 13-cv-01236 (D.D.C. Aug. 13, 2013) ("DOJ Complaint"), *available at* http://www.justice.gov/atr/cases/f299900/299968.pdf

[6] *Id.*

[7] *Id.*

North American airlines will obtain approximately $13.2 billion in net after-tax profits in 2015, a number that exceeds the industry's previous peak profits from the 1990s.

33.     According to data from the federal Department of Transportation's Bureau of Transportation Statistics, the average domestic airfare rose at an inflation-adjusted 13% from 2009 to 2014.  As discussed below, much of this rise in prices results directly from Defendants' mutual commitment to keep airline capacity artificially low.  Defendants   also   engaged   in   a concerted campaign to reduce consumers' ability to compare air fares by limiting online travel agencies' ("OTAs") access to fare data and by forcing consumers to use Defendants' websites rather than other retail channels for domestic airline tickets.

**B.     Defendants Conspired to Increase Prices by Artificially Limiting Flight Capacity**

34.     On June 11, 2015, *The New York Times* reported on a meeting of the IATA, which hosted the world's top airline executives, including Defendants, and on their repeated use of the term "discipline."   The *Times* described the use of this terms as "classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins."[8]

35.     For example, American's CEO, Doug Parker, said the airlines learned their lessons from past price wars, telling Reuters that "I think everybody in the industry understands that."[9] Delta's president Ed Bastian stated that Delta is "continuing with the discipline that the marketplace is expecting."[10] Air Canada's chief executive, Calin Rovinescu, stated, "[p]eople were

---

[8] *See* James B. Stewart, *"Discipline" for Airlines, Pain for Fliers*, N.Y. Times (June 11, 2015), *available at* http://www.nytimes.com/2015/06/12/business/airline-discipline-could-be-costly-for-passengers.html.

[9] *Id.*

[10] *Id.*

undisciplined in the past, but they will be more disciplined this time."[11] And United's CEO Jeff Sismek said earlier this year, while announcing his company had nearly doubled profits in 2014, that "[w]e will absolutely not lose our capacity discipline," *i.e.*, the practice of limiting expansion in order to keep airfares high.[12]

36.     According to Fiona Scott Morton, professor of economics at Yale University and a former deputy attorney general in the antitrust division of the DOJ, "[w]hen airline industry leaders say they're going to be 'disciplined,' they mean they don't want anyone to expand capacity.  And when there aren't enough seats, airlines raise prices.  That's what we've been seeing."[13] Christopher L. Sagers, an antitrust professor at Cleveland Marshall College of Law, agreed: "[T]hey're all but saying you need to limit output to keep up prices."[14] As a result of such capacity discipline, IATA recently projected that airline industry profits would more than double in 2015 to nearly $30 billion.

37.     The industry's comments indicate existing collusion and plans to continue colluding. In particular, the airlines signaled to Southwest, which recently broke ranks and announced a planned 8% increase in its seating capacity, to limit capacity.     After     the     conference, Southwest quickly revised its projections and reassured investors it was not "going rogue," as its chief executive explained: "We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth, year-over-year, to approximately 7 percent."[15] The

---

[11]*Id.*

[12]Brad Tuttle, *The pathetic state of airline travel today was predicted long ago*, Fortune (Apr. 24, 2015), *available at* http://fortune.com/2015/04/24/state-of-airline-travel/.

[13]Stewart, *supra*.

[14]*Id.*

[15]*Id.*

difference between 7% and 8% capacity growth for Southwest amounts to the ability to carry more than 1.3 million additional passengers in a year.[16]

38.    Defendants' position on capacity has been disseminated, in part, by the trade group Airlines for America, to which all Defendants belong.  The group provides a forum for discussion of the airlines' position on capacity and on other topics.

39.    Throughout the Class Period, Defendants collectively kept seating capacity on domestic flights virtually unchanged, despite the increased demand which accompanied a growing economy.[17] From January 2010 to January 2014, capacity on domestic flights was virtually flat while the U.S. economy grew about 2.2% per year.   During the Class Period, Defendants filled a higher percentage of seats on planes and made a very public effort to slow growth in order to command higher airfares.  From January 2014 to January 2015, the airlines expanded by 5.5%, topping the economy's 2.4% growth for 2014.[18] By not increasing capacity to respond to consumer demand, the airlines were able to charge exorbitant ticket prices, which rose an inflation-adjusted 13% from 2009 to 2014 according to the U.S. Bureau of Transportation Statistics.[19]

40.    Increased ticket prices have led to record profits despite falling costs.  U.S. airlines earned a combined $19.7 billion in the past two years and IATA's $30 billion projection for 2015 is bolstered by the dramatic drop in the price of jet fuel, which is the airlines' single

---

[16]*See*  http://www.swamedia.com/channels/Corporate-Fact-Sheet/pages/corporate-fact-sheet (last visited September 4, 2015) (noting that Southwest flew 136 million passengers last year).

[17]*See* Fiona Scott Morton, R. Craig Romaine & Spencer Graf, *Benefits of Preserving Consumers' Ability to Compare Airline Fares* (May 19, 2015), *available at* http://www.traveltech.org/wp-content/uploads/2015/05/CRA.TravelTech.Study_.pdf

[18]*See* http://mashable.com/2015/07/01/justice-department-airlines-investigation/ (visited September 4, 2015).

[19] *Id.*

highest expense. Illustrative of Defendants' conspiracy is the lack of price movement in response to recent, significant decreases in the cost of jet fuel. One estimate found that for April 2015, United States airlines paid $1.94 per gallon for jet fuel, a decrease of 34% from the previous year. Nevertheless, airfares have continued to rise, regardless of the decrease in airline operating costs. As long as capacity is limited, there is no incentive for airlines to reduce fares, regardless of how low fuel prices drop.   As Ms. Morton explained, "on most airline routes, consumers have very little choice," and not until "the recent wave of consolidation among airlines have they been able to set prices significantly above marginal cost."[20]

41.     In the absence of collusion, cost savings due to decreased expenses, including jet fuel expenses, would be passed on to consumers in the form of decreased prices for airline tickets. But as Defendants' costs have plummeted, the prices Defendants have charged Plaintiff and the Class have skyrocketed.

## C.     Defendants Agreed to Reduce Output Through "Capacity Discipline" Resulting in Higher Fares and Fees for Passengers

42.     Defendants' primary mechanism in their efforts to collusively raise prices for airline consumers is their shared commitment to enforcing "capacity discipline."   As used by Defendants, "capacity discipline" is a euphemism for limiting the number of flights and seats available to consumers. Defendants' coordination on offering only ever-higher fares for the artificially limited number of flights enabled Defendants to raise prices for domestic airline tickets to supracompetitive levels.

43.     Defendants' recently-discovered "capacity discipline" can be traced back to the industry's most recent wave of consolidation.     As the DOJ noted in its August 2013 complaint against the American-US Airways merger, each significant legacy airline merger in

---

[20] Stewart, *supra.*

recent years (the "legacy" airlines are American, Delta, and United) has been followed by substantial reductions in capacity.[21] According to the DOJ, "[t]hese capacity reductions have not consisted simply of cancellation of empty planes or empty seats; rather, when airlines have cut capacity after a merger, the number of passengers they carry on the affected routes has also decreased."[22]

44.     Of course, "capacity discipline" does not work to an airlines if that airline is the only competitor exercising such "discipline."   If a single airline reduces capacity on its flights and raises prices as a result, then travelers will turn to other airlines with more capacity and, thus, lower prices.  But if airlines act in concert, passengers have no choice but to pay higher prices or not fly at all.

45.     Defendants have confirmed their adherence to this capacity discipline.

**Delta**:

46.     On July 25, 2012, Delta's CEO, Richard Anderson, stated, "Capacity discipline is our key lever. We will continue to actively manage our capacity."[23]

47.      On April 23, 2013, Mr. Anderson stated, "Capacity discipline have built a strong permanent revenue producing foundation for Delta with the eighth consecutive quarter of a year-on-year revenue premium."[24]

---

[21] *See* http://www.justice.gov/atr/cases/f299900/299968.pdf (visited on July 10, 2015).

[22] *See* http://airwaysnews.com/blog/2013/08/22/why-the-dojs-arguments-against-the-americanus-airways-merger-are-doa-part-i/ (visited on September 4, 2015).

[23]*See* http://seekingalpha.com/article/749071-delta-air-lines-ceo-discusses-q2-2012-results-earnings-call-transcript (visited September 4, 2015).
[24] *See* http://seekingalpha.com/article/1362881-delta-air-lines-management-discusses-q1-2013-results-earnings-call-transcript?page=2 (visited September 4, 2015).

48.     On October 22, 2013, Delta's President, Ed Bastian, stated, "Rest assured that our commitment to maintaining strong capacity discipline remains in place."[25]

49.     In announcing Delta's 2014 fourth quarter results, Mr. Anderson, stated, "As we begin 2015, we have a significant opportunity from lower fuel prices, which will drive more than $2 billion in fuel savings over 2014.  Through our capacity discipline, pricing our product to demand, and the fuel savings, we expect to drive double-digit earnings growth, along with increased free cash flow and a higher return on invested capital in the upcoming year."[26]

50.     On July 23, 2014, Mr. Anderson stated, "As we look forward to the remainder of 2014 and beyond, Delta will continue to maintain the steady course we have been on, especially our disciplined approach to capacity levels.  This discipline continues to be a key driver of our success, as we will post record results for 2014."[27]

51.     More recently, Mr. Anderson (echoing the comments of United's Smisek cited above) stated: "We are not making any changes to our 2015 capacity plan in light of the lower fuel prices. . . . In fact, we continue to trim capacity on the margin to maintain yields."[28]

52.     On April 15, 2015, Mr. Anderson stated, "We will continue to be disciplined with our domestic capacity levels, with our domestic growth driven by higher gauge and fewer total airplanes, which will cause us to improve efficiency and drive higher operating margins."[29]

---

[25]*See* http://seekingalpha.com/article/1760882-delta-air-lines-management-discusses-q3-2013-results-earnings-call-transcript (visited September 4, 2015).

[26]*See* http://ir.delta.com/news-and-events/news/news-release-details/2015/Delta-Air-Lines-Announces-December-Quarter-Results/ (visited on September 4, 2015).

[27]*See* http://seekingalpha.com/article/2334145-delta-air-lines-dal-ceo-richard-anderson-on-q2-2014-results-earnings-call-transcript (visited on September 4, 2015).

[28]*See* http://www.thestreet.com/story/13016781/2/delta-air-lines-dal-earnings-report-q4-2014-conference-call-transcript.html (visited on September 4, 2015).

**United:**

53.     On July 2012, United's Executive Vice President and Chief Revenue Officer, Jim Compton, stated, "We remain committed to capacity discipline to generate sustained and sufficient profitability."[30]

54.     On January 23, 2014, Mr. Compton stated, "Let me assure you that we will continue to be disciplined in how and where we deploy capacity."[31]

55.     On October 23, 2014, Mr. Compton stated, "Continued capacity discipline has supported the consistent unit revenue growth in the last several quarters and we expect domestic strength to continue into the fourth quarter."[32]

56.     Jeff Smisek, United's Chairman, President, and CEO was quoted in January 2015 while announcing a $2 billion profit for United in 2014 that "[w]e will absolutely not lose our capacity discipline. . . . It's very health for us and very healthy for the industry."[33] On April 23, 2015, Mr. Smisek stated, "United has been the industry leader in capacity discipline, and as we

---

[29]*See* http://www.thestreet.com/story/13114108/2/delta-air-lines-dal-earnings-report-q1-2015-conference-call-transcript.html (visited on September 4, 2015).

[30]*See* http://www.nytimes.com/2012/07/31/business/airlines-adjust-their-fleets-and-passengers-often-suffer-on-the-road.html (visited on September 4, 2015).

[31]*See* http://articles.chicagotribune.com/2014-01-23/business/chi-united-continental-swings-to-4q-profit-as-fares-rise-20140123_1_united-ceo-jeff-smisek-united-airlines-united-continental-holdings (visited on September 4, 2015).

[32]*See* http://www.thestreet.com/story/12925828/3/united-continental-holdings-ual-earnings-report-q3-2014-conference-call-transcript.html (visited on September 4, 2015).

[33] *See* http://www.travelandleisure.com/articles/why-travelers-should-love-it-when-travel-stocks-tank (visited on September 4, 2015).

have shown in the past, we will take the appropriate actions to ensure we are matching capacity with demand."[34]

**American:**

57.     Prior to the American-US Airways merger, American had planned to expand domestically and internationally, adding additional flights and service on nearly 115 new routes. However, after the merger, the new American quashed that plan, choosing instead to toe the line with its competitors by exercising "capacity discipline."

58.     American's president, Scott Kirby, confirmed at an investment conference on March 3, 2015 that the company would not be adding capacity via additional airplanes: "Almost all of our capacity growth domestically is about putting more seats on airplanes."[35] This type of capacity increase is *de minimus* and still permits the airline to charge higher rates because of the lack of additional flights.

59.     Indeed, as American's Kirby confirmed, each of the four Defendants were only interested in increasing capacity by way of cramming a relatively small number of additional seats onto airplanes: "All airlines for the most part are putting more seats on airplanes.  We're doing it.  United's doing it.  Delta's doing it.  Even Southwest is continuing to put more seats on their existing aircraft.  Once you've done that, you're done."[36]

60.     On January 27, 2015, American's Executive Vice President and Chief Financial

---

[34] *See* http://www.thestreet.com/story/13125023/2/united-continental-holdings-ual-earnings-report-q1-2015-conference-call-transcript.html (visited on September 4, 2015).

[35]  *See*  http://www.dallasnews.com/business/airline-industry/20150303-u.s.-airlines-are-growing-without-adding-airplanes.ece (visited on September 4, 2015).

[36] *Id.*

Officer, Derek Kerr, stated, "There has been a lot of talk of capacity changes in response to lower fuel prices. You won't see any changes from us in the near future since we continue to run the Airline as though high fuel prices will return."[37]

**Southwest:**

61.     On April 25, 2013, Gary Kelly, Chairman, President, and CEO of Southwest stated, "We're going to be disciplined. We're going to manage our capacity."[38]

62.     On April 24, 2014, Southwest's Tammy Romo, Senior Vice President, Finance and Chief Financial Officer, stated, "We continue to have a disciplined growth strategy with flat year-over-year ASM capacity in 2014."[39]

63.     On January 22, 2015, in response to a question from Jack Nicas, a *Wall Street Journal* analyst, about whether the windfall from cheaper fuel would lead to airlines adding capacity, Mr. Kelly responded, "With respect to our capacity plans, again, I think we've been very clear this morning to say that we're really not changing our business plan for 2015 with respect to those kinds of topics."[40]

64.     In the few instances where it appeared that a Defendant might break from the capacity limitation conspiracy, the response was swift and effective.   On May 20, 2015, Mr. Kelly announced a break from the industry stance on discipline, stating that Southwest planned to

---

[37] *See* http://www.fool.com/investing/general/2015/07/28/5-things-american-airlines-group-inc-management-wa.aspx?source=isesitlnk0000001&mrr=1.00 (visited on September 4, 2015).

[38] *See* http://seekingalpha.com/article/1373931-southwest-airlines-management-discusses-q1-2013-results-earnings-call-transcript (visited on July 10, 2015).

[39] *See* southwest.investorroom.com/download/LUV_1Q14_Transcript.pdf (visited on September 4, 2015).

[40] *See*  http://seekingalpha.com/article/2843006-southwest-airlines-luv-ceo-gary-kelly-on-q4-2014-results-earnings-call-transcript (visited on September 4, 2015).

increase its capacity by as much as eight percent by acquiring two new gates at its hub at Love Field, Dallas.[41] The industry reaction was instantaneous.    The stock prices of the other Defendants plummeted. Raymond James analyst Savanthi Syth wrote in response to the shift, in a research note: "understandably, investors are questioning if this signals the end of the era of industry capacity discipline."[42] Additionally, Wolfe Research airline analyst Hunter Keay stated: "Domestic capacity discipline has effectively vanished."[43]

65.    As a result of this announcement, the other Defendants took action to ensure that Southwest did not destroy capacity discipline.

66.    The IATA's annual meeting took place on June 7-9, 2015 in Miami, Florida. Chief executives of many of the leading passenger airlines were in attendance.    During the course of that meeting, several of them spoke publicly about the need for "discipline" within the industry. Delta's President, Ed Bastian, said that Delta is "continuing with the discipline that the marketplace is expecting."[44] American's chief executive, Douglas Parker, stated that the airlines

---

[41] *See* http://www.startribune.com/airline-shares-plunge-after-southwest-announces-capacity-expansion/304438361/ (visited on September 4, 2015).

[42] *Id.*

[42] *See* http://www.wsj.com/articles/southwests-upgraded-growth-plans-stir-airline-stocks-1432157456 (visited on September 4, 2015).

[43] *See* http://www.wsj.com/articles/southwests-upgraded-growth-plans-stir-airline-stocks-1432157456 (visited on September 4, 2015).

[44] *See* http://www.reuters.com/article/2015/06/08/us-airlines-profits-idUSKBN0OO2AT20150608 (visited on September 4, 2015).

had learned their lessons from past price wars, noting that "I think everybody in the industry understands that."[45]

67.     On June 11, 2015, the *New York Times* published an article titled "'Discipline' for Airlines, Pain for Fliers," in which the author, James B. Stewart, commented: "Discipline is classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins. This year, that discipline seems to be working: the IATA projected this week that airline industry profits would more than double this year to nearly $30 billion, a record."[46] The *New York Times* also noted:

> When airline industry leaders say they're going to be disciplined, "they mean they don't want anyone to expand capacity," said Fiona Scott Morton, professor of economics at Yale and a former deputy attorney general in the antitrust division of the Justice Department. "And when there aren't enough seats, airlines raise prices. That's what we've been

seeing."[47]

68.     The statements of the various airline executives and the pressure placed on Southwest at the IATA meeting had the desired effect.     The *Times* article also noted, "after coming under fire at this week's conference, Southwest quickly moved to reassure investors it isn't going rogue.  'We have taken states this week to begin pulling down our second half 2014 to manage our 2015 capacity growth . . .' Kelly said."[48]

69.     The airline mergers have facilitated Defendants' agreement on capacity constraints. In May 2010, United and Continental announced their planned merger. The

---

[45] *See* http://www.reuters.com/article/2015/06/07/us-airlines-iata-american-idUSKBN0ON0YC20150607 (visited on September 4, 2015).

[46] *See* http://www.nytimes.com/2015/06/12/business/airline-discipline-could-be-costly-for-passengers.html (visited on September 4, 2015).

[47] *Id.*

[48] *Id.*

announcement caused speculation about the future of each airline's hubs, including Continental's Cleveland hub. In Congressional testimony, an industry analyst stated that he did not believe the merger would cause reductions in Cleveland. On June 18, 2010, upon seeing the testimony, US Airways' CEO wrote an email to other US Airways executives stating, Surely these guys [United/Continental] aren't really planning to keep Cleveland open. I'm hopeful they're just saying what they need to (including to [the analyst]) to get this approved."[49] United and Continental closed their deal on October 1, 2010.  The combined airline has reduced capacity at nearly all its major hubs (including Cleveland) and at many other airports where the two airlines previously competed.

70.     Similarly, Southwest/AirTran reduced service in a number of its focus cities and on many of AirTran's former routes following its 2011 merger.

71.     US Airways was interested in its merger with American because US Airways' senior executives were concerned that American was about to embark on a growth plan that would disrupt the industry's capacity discipline.  US Airways believed that, if American implemented its growth plans, which included placing "the largest order for new aircrafts in the industry history," other airlines would "react to AMRs plans with their own enhanced growth plans destabilizing the industry."[50] US Airways believed that American's standalone capacity growth would "negatively impact"[51] industry revenues and threaten industry pricing.

---

[49] *See* http://www.dansdeals.com/archives/33646 (visited on July 10, 2015).

[50] *See* http://airwaysnews.com/blog/2013/08/25/why-the-dojs-arguments-against-the-americanus- airways-merger-are-doa-part-ii/ (visited on July 10, 2015).

[51] *Id.*

72.     Defendants' agreement on capacity discipline has achieved its intended result of maintaining or increasing customers' fares and fees and thereby increasing Defendants' revenues and profits.

73.     Capacity discipline has also led to higher fees for airlines.  The airline industry has increasingly charged consumers fees for services that were previously included in the price of a ticket.  These so-called ancillary fees, including those for checked bags and flight changes, have become very profitable.  In 2012 alone, airlines generated over $6 billion in fees for checked bags and flight changes.  In 2013, Defendants generated more than $12 billion in ancillary revenue.

74.     As a result of their agreement on capacity, Defendants have earned record profits. In the past two years alone, United States airlines earned a combined $19.7 billion.

**D.     Defendants Coordinated To Reduce Airfare Price Transparency**

75.     Defendants have also reduced price transparency within the industry by targeting OTAs and metasearch websites.[52] The purpose of these efforts is both to eliminate comparison shopping (and the competition it brings) and increase prices by driving online ticketing traffic to Defendants' own websites or reducing the benefits of using OTAs and metasearch sites.

76.     On May 19, 2015, the Travel Technology Association issued a report prepared by Charles River Associates and authored by Dr. Fiona Scott Morton entitled "Benefits of Preserving Consumers' Ability to Compare Airline Fares" (the "TTA Report").[53] The TTA

---

[52]A metasearch travel site is one in which an online user may compare prices from several different travel sources, such as the airlines and OTAs.  Some of the most well-known metasearch sites include Kayak, TripAdvisor, Google Flights, Hipmunk, Skyscanner, and Fly.com.

[53] *See* http://www.traveltech.org/wp-content/uploads/2015/05/CRA.TravelTech.Study_.pdf (visited on July 10, 2015).

Report noted that completion within the U.S. airline industry had suffered because of domestic passenger airline mergers and the major airlines' collective efforts to lead travelers away from OTAs.

77.     By providing comparisons among different airlines' prices for the same routes, OTAs facilitate price transparency. On information and belief, each of Defendants have demanded that OTAs, both large and small, agree to onerous terms that would prevent the OTAs from providing accurate price comparisons for consumers, force the OTA to refrain from offering any further price comparisons at all, or add on fees to consumers for using OTA services that would erase any benefit to having the price transparency that OTAs provide. The airlines' coordinated efforts to restrict OTAs' ability to provide such comparisons and price reductions was and remains a blatant attempt to drive up prices.

78.     The TTA Report found, among other things,  that restrictions by airlines of broad access to airline information—i.e., prices and schedules—substantially increase prices.  The TTA Report estimates the potential costs to passengers could exceed $6 billion per year.

79.     Airline markets are highly concentrated, with significant barriers to entry.  The recent merger of American Airlines and US Airways, for example, has led to fare increases in affected city-pair markets that are about 4 percent higher than in non-affected markets.[54] In certain city-pair markets in which the American-US Airways merger reduced the number of significant competitors from 3 to 2, or from 2 to 1, fare increases have been 7 to 17 percent.  The effect of limited access to airline fare and schedule information may be even larger in duopoly or monopoly city-pairs.

---

[54] "City-pair" refers to the two cities on either side of an airline route. Thus, a flight between Washington, D.C. and New York is considered the "D.C.-New York city-pair."

80.     The TTA Report also notes that Defendants have engaged in coordinated efforts to stifle online metasearch airfare websites.  These efforts include:  prohibiting metasearch sites from referring consumers to an OTA for booking a flight; prohibiting OTAs from providing airline information to metasearch sites; prohibiting global distribution systems ("GDSs") from providing airline price and schedule information to "unauthorized" metasearch sites;[55] prohibiting onward-distributing flight schedule information to metasearch sites by services such as Innovata; refusing to pay metasearch sites for direct referrals to the airline's own booking website; and prohibiting metasearch sites from displaying price information of the airline.

81.     Each of the four Defendants has engaged in the activities discussed above.  On information and belief, the value to Defendants of quashing competition that OTAs and metasearch sites provide could be as much as $30 per passenger.

**E.     Senators Schumer and Blumenthal Urge the DOJ to Investigate Defendants' Conduct**

82.     In December 2014, United States Senator Charles E. Schumer (D-NY) called for a federal investigation of United States airlines.  As Senator Schumer stated: "[i]t's hard to understand, with jet fuel prices dropping by 40 percent since last year, why ticket prices haven't followed."[56] "At a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity," said Senator Schumer.  "So I'm urging the feds to step in and do a price investigation on behalf of consumers

---

[55] GDSs are the intermediaries between OTAs and airlines that aggregate flight information across airlines.  GDSs link directly to airlines' reservation systems and enable travel agents with a single connection to a GDS to book flights with all of the airlines.  GDSs also offer OTAs competitive rates of compensation for their distribution services, which enables OTAs to offer lower prices to travelers.

[56] *See http://www.nytimes.com/2015/07/02/business/airlines-under-justice-dept-investigation-over-possible-collusion.html?_r=0* (visited September 4, 2015)

who must buy holiday travel tickets that can break the bank. The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather.  That is why I urge the DOJ and DOT to immediately investigate why airline profits are not more efficiently being passed down to consumers."[57]

83.     Following the publication of *The New York Times* article on the IATA meeting, on June 17, 2015, Senator Richard Blumenthal of Connecticut asked the United States Department of Justice ("DOJ") to immediately investigate collusion and anti-competitive behavior amongst U.S. airline companies following a meeting of top executives at the IATA annual conference.  Citing *The New York Times* report and statements in the DOJ's complaint to block the 2013 American and US Airways merger, Senator Blumenthal "urge[d] the Antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by recent pricing patterns as well as remarks made at the IATA conference."[58]

84.     Senator Blumenthal's letter went further, recalling the DOJ's previous concerns raised during its investigation into the US Airways/American merger:

> The Complaint specifically documented the troubling history of US Airways communicating directly to a rival airline that it was upset by that airline's efforts to compete more aggressively.  In 2010, senior executives at US Airways complained that competition from the rival airline was "hurting profitability" in the industry.  DOJ wrote: "[S]enior management debated over email about how best to get the rival airline's

---

[57] *Id.*

[58] *See* http://www.blumenthal.senate.gov/newsroom/press/release/citing-unprecedentedconsolidation-within-airline-industry-blumenthal-urges-doj-to-investigate-potential-anticompetitive-anti-consumer-behavior-and-misuse-of-market-power (visited on September 4, 2015).

attention and bring it back in line with the rest of industry…[The CEO] urged the other executives to, 'portray these guys as idiots to Wall Street and anyone who'll listen.'"

The Justice Department also correctly predicted that this kind of behavior would continue should the merger be allowed to proceed – as it ultimately was. In the original complaint, DOJ wrote, "The structure of the airline industry is already conducive to coordinated behavior…the legacy airlines closely watch the pricing moves of their competitors. When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."[59]

85.     Finally, Senator Blumenthal concluded with a plea to act:

I therefore urge the Antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by  recent pricing patterns as well as remarks made at the IATA conference. Consumers are paying sky-high fares and are trapped in an uncompetitive market with a history of collusive behavior. If you find that these comments were coordinated to punish Southwest Airlines' announcement of capacity increases, I urge you to use all the tools at your disposal to punish this anti-competitive and anti-consumer behavior.[60]

## F.     The Department Of Justice Initiates An Investigation Into All Four Defendants

86.     On July 1, 2015, the DOJ confirmed that it was conducting an antitrust investigation into the airline industry to determine whether some airlines are colluding in reducing capacity and slowing their rate of growth in an effort to command higher airfares.  A spokesperson for the DOJ, Emily Pierce, confirmed this report, stating that the DOJ was investigating "possible unlawful coordination" to limit capacity increases, thereby keeping ticket prices high.[61]

---

[59]*Id.*

[60]*Id.*

[61]*See*  http://www.cnn.com/2015/07/01/politics/doj-subpoenas-airlines-unlawful-coordination/ (visited on September 4, 2015).

87.    The Associated Press ("AP") first reported on the investigation, which it described as involving "possible collusion among major airlines to limit available seats, which keeps airfares high."[62] The AP article reported that the investigation "appears to focus on whether airlines illegally signaled to each other how quickly they would add new flights, routes and extra seats."[63]

88.    According to the Associated Press, the CID requested the following information:[64]

a.    Tell us who in your company sets the communications strategy to shareholders, investors or analysts and who does that communication.

b.    Give us any documents "discussing (a) the need for, or the desirability of, capacity reductions or growth limitations by the company or any other airline; or (b) the undesirability of your company or any other airline increasing capacity."

c.    Give us any of your documents that talk about changes in your capacity or that of your competitors.

d.    Give us any communications between you and outside parties about your capacity or that of your competitors and how capacity changes affect fares, revenues or profits.

---

[62] *See* David Koenig, Scott Mayerowitz and Eric Tucker, US probing possible airline collusion

[63] *Id.*

[64] *See* http://aviationblog.dallasnews.com/2015/07/ap-justice-is-looking-into-airline-collusion-on-holding-down-capacity.html/ (visited on September 4, 2015)

e.    Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have had involving industry analysts (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts).

f.    Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have had involving other airlines in which capacity was discussed (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts).

g.    We want to know everybody who owns at least 2 percent of your company, including the time that person owned that much of your company.

h.    Concerning those people who owned at least 2 percent, tell us about all your meetings, appointments or conferences with those people in which industry capacity was discussed. We want to see any calendars, appointment books, day planners, etc., that were involved, as well as any documents prepared for those discussions and which talked about those discussions afterward.

i.    We want to know how much capacity you flew, in available seat miles, every month since January 2010, and please include the seat miles flown by your regional partners as well.

j.    Spell out your document retention policy including emails.

k.    Tell us who is preparing this information and submitting it to us. If someone gives that preparer some oral instructions, tell us who gave the oral instructions and what he and she said.

89.    According to the DOJ's Antitrust Division Manual, last updated in April 2015, before a CID is issued, a section or field office must be authorized to conduct a preliminary investigation into a potential antitrust violation. In order to obtain authorization for a preliminary investigation, several factors are considered, the first one being "whether there is reason to believe that an antitrust violation may have been committed." Ch. III § B(1). Furthermore, "[i]n a civil matter, from the outset, attention should be given to the legal theory, relevant economic learning, the strength of likely defenses, any policy implications, the potential doctrinal significance of the matter, and the availability of an effective and administrable remedy. The greater the potential significance of the matter, the more likely the request to open an investigation will be approved." *Id.* (emphasis added).

90.    On July 1, 2015, George Jepsen, the Attorney General of the State of Connecticut, announced that his office was also conducting a similar investigation into collusive activity among air carriers, and had sent letters to American, Delta, Southwest and United.[65]

91.    Senators Blumenthal and Schumer publicly applauded the DOJs investigation of Defendants. Senator Blumenthal stated, "[t]his investigation must be tireless and timely to save consumers from the onslaught of price increases in summer fares that may result from collusive and anticompetitive airline company misconduct."[66] Senator Schumer agreed, "[i]t's hard to

---

[65]*See* http://www.reuters.com/article/2015/07/01/airlines-connecticut-probe-idUSL1N0ZH2KB20150701 (visited on July 10, 2015).

[66]*See* http://www.politico.com/story/2015/07/airlines-price-collusion-investigation-justice-department-119642.html (visited on September 4, 2015).

understand, with jet fuel prices dropping by 40 percent since last year, why ticket prices haven't followed . . . . We know when airlines merge, there's less price competition."[67]

92.      The news of the investigations has been well received by industry experts.  "The number one concern that antitrust experts have – with no close second – as with regard to radical consolidation of any industry, is the risk of tacit competitor coordination on policies, practices and prices among a reduced number of industry participants," said Business Travel Coalition Chairman Kevin Mitchell.[68]  "Since recent U.S. airline mega-mergers, we have witnessed near constant airline CEO calls for 'capacity discipline' during industry gatherings and analyst earnings calls only to be echoed by analysts in follow-on earning calls with other airlines.  This represents perhaps the darkest hours of airline coordination as well as a too-cozy harmonization between airlines and Wall Street."[69]

## ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

93.      Plaintiff did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein prior to the 2015 comments cited in this complaint.   Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiff and Class members. These violations constitute injurious acts that restart the applicable statute of limitations each time they are committed.

---

[67]*See* http://www.npr.org/sections/thetwo-way/2015/07/01/419245511/justice-department-investigating-airlines-for-possible-price-collusion (visited on September 4, 2015).
[68] *See* http://www.eturbonews.com/60957/business-travel-coalition-applauds-doj-investigation-airline-coo (visited on September 4, 2015).

[69] *See* Adam Leposa, *U.S. Justice Department Launches Airline Antitrust Probe* (September 4, 2015), *available at* http://www.travelagentcentral.com/air-travel/us-justice-department-launches-airline- antitrust-probe-52146.

94.     In addition, Defendants' and their co-conspirators' agreement, understanding, and conspiracy in violation of the antitrust laws was kept secret. As a result, Plaintiff and the Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying supracompetitive prices for domestic airline tickets throughout the Class Period. Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

95.     Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

96.     Neither Defendants nor their co-conspirators told Plaintiff or other Class members that they were fixing prices, or engaging in the other unlawful collusive practices alleged herein. By its very nature, Defendants' and their co-conspirators' conspiracy was inherently self-concealing.

97.     On information and belief, Defendants and their co-conspirators engaged in a successful price-fixing conspiracy, which they affirmatively concealed:

a.     by meeting secretly (including use of private telephonic communications) to discuss prices, customers, capacity, and markets for domestic airline tickets sold in the United States and elsewhere;

b.     by agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

     c.      by holding secret meetings outside and separate from the formal trade association meetings Defendants were publicly attending; and

     d.      by disguising price-fixing meetings and communications as technical and operational meetings.

## PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

98.    Defendants' unlawful contract, combination, and/or conspiracy had the following effects, among others:

     a.      Prices charged by Defendants and their co-conspirators to Plaintiff and the members of Class for domestic airline tickets were maintained at artificially high and supracompetitive levels;

     b.      Plaintiff and members of the Class were required to pay more for domestic airline tickets than they would have paid in a competitive marketplace unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing; and

     c.      Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for domestic airline tickets.

99.    During the Class Period, Defendants charged supracompetitive prices for domestic air passenger transportation services sold to Plaintiff and the Class.  By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for domestic air passenger transportation

services than they would have paid in the absence of an illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.

100.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

101.    Plaintiff brings this action on behalf of herself and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as representative of a Class defined as follows:

> All persons or entities (but excluding Defendants, their officers, directors, and employees, as well as Defendants' parents, predecessors, successors, subsidiaries, and affiliates) who purchased domestic air passenger transportation services in the United States, its territories, or possessions directly from any Defendant, or from any of their parents, predecessors, successors, subsidiaries, or affiliates, at any time during the period from and including July 10, 2011, to the present.  (the "Class Period").

102.    Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable.  While the exact number of Class members is unknown to Plaintiff, it is believed to be in the thousands, if not millions, and geographically dispersed throughout the United States.  The Class is readily identifiable from information and records in possession of Defendants.

103.    Plaintiff's claims are typical of the claims of the Class.  Plaintiff and the Class were damaged by the same wrongful conduct by Defendants, that is, they have paid artificially inflated prices for domestic air passenger transportation services as a result of Defendants' anti-competitive and unlawful conduct.

104.    Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and Class members purchased tickets from Defendants at artificially maintained,

supracompetitive prices established by the actions of Defendants in connection with the restraint of trade alleged herein.  Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class.

105.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action litigation.

106.    Questions of law and fact common to the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.   Such generally applicable conduct is inherent in Defendants' anti-competitive and unlawful conduct.

107.    Questions of law and fact common to the Class, which predominate over any individual issues, include, but are not limited to:

      a.    Whether Defendants combined, agreed, or conspired to fix, raise, maintain, or stabilize the prices of domestic air passenger transportation services sold in the United States;

      b.    The existence, extent, and duration of the illegal contract, combination, or conspiracy alleged herein;

      c.    The nature and character of the acts performed by Defendants in furtherance of the conspiracy;

      d.    Whether the contract, combination, or conspiracy caused prices of domestic air passenger transportation services to be higher than they would have been in the absence of Defendants' conduct;

e.     Whether Defendants' conduct caused the prices of domestic air passenger transportation services sold in the United States to be at artificially high and non-competitive levels;

f.     Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class;

g.     Whether Defendants' conduct violated Section 1 of the Sherman Act;

h.     Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of §1 of the Sherman Act, and

i.     The appropriate measure of the damages suffered by Class members.

108.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would engender.  Prosecution as a class action will eliminate the possibility of repetitive litigation. Class treatment will permit the adjudication of relatively small claims by Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this litigation.  Thus, absent the availability of a class action, it would not be feasible for Class members to redress the wrongs done to them.

109.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

110.    There will be no material difficulty in the management of this action as a class action.

111.    The claims asserted herein are also appropriate for class certification under the laws of each of the states under which claims are asserted.

## CLAIMS FOR RELIEF

## VIOLATION OF THE SHERMAN ACT § 1 AND THE CLAYTON ACT § 4

112.    Plaintiff realleges and incorporates by reference all the above allegations as if fully set forth herein.

113.    During the Class Period, Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 4 of the Clayton Act, 15 U.S.C. § 15 by artificially reducing or eliminating airfare competition and engaging in a conspiracy to artificially fix, raise, maintain, and/or stabilize the prices for flights in the United States.

114.    In particular, Defendants have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of airfares in the United States.

115.    In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize the prices of airfares for flights in the United States.

116.    The acts done by each Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their high-level officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

117.    The anti-competitive acts were intentionally directed at the United States market for domestic air passenger transportation services and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for domestic air passenger transportation services throughout the United States.

118.    Defendants' anti-competitive activities have proximately caused injury to Plaintiff and the Class in the United States.

119.    As a direct and proximate result of the contract, combination, or conspiracy among Defendants alleged in this complaint, the prices charged to Plaintiff and the Class for domestic air passenger transportation services were unlawfully raised, fixed, maintained, or stabilized in the United States.

120.    By reason of Defendants' unlawful conduct, Plaintiff and members of the Class have been deprived of free and open competition in the purchase of air travel.

121.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

122.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

> a.    Prices charged to Plaintiff and the Class for domestic air passenger transportation services were raised, fixed, maintained, or stabilized at supra- competitive levels;
>
> b.    Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the markets for domestic air passenger transportation services; and

c.    Competition in establishing the prices paid for domestic air passenger transportation services has been unlawfully restrained, suppressed, or eliminated.

123.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have been damaged in their business or property by paying prices for domestic air passenger transportation services that were higher than they would have been but for Defendants' unlawful conduct resulting in an amount of ascertainable damages to be established at trial.

124.    As a direct and proximate result of Defendants' illegal agreement, contract, combination trust and/or conspiracy, Plaintiff and the members of the Class have been injured and damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

125.    The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.    The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including that the agreement, contract, combination, or conspiracy and the acts done in

furtherance thereof by Defendants and their co-conspirators be adjudged to have been a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of the action, including reasonable attorneys' fees, and pre and post-judgment interest.

C.      Each of Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action as alleged herein.

D.      Joint and several judgments be entered for Plaintiff and the Class against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees; and

E.      Plaintiff and the Class be granted such further and other relief as the case may require or as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury trial of all claims asserted in this Complaint so triable.

DATED:  September 9, 2015                    Respectfully Submitted,
                                            */s/ Richard B. Brualdi*
                                            **THE BRUALDI LAW FIRM, P.C.**
                                            29 Broadway, Suite 2400
                                            New York, New York 10006
                                            Telephone: (212) 952-0602
                                            Facsimile:   (212) 952-0608
                                            Email: rbrualdi@brualdilawfirm.com
                                            *Counsel for Plaintiff and the Proposed Class*